**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle

Final Report: November 17, 2020
Date Submitted: October 7, 2020

***Via File & ServeXpress***
James P. Sharp, Esquire
Moore & Rutt, P.A.
122 West Market Street
P.O. Box 554
Georgetown, Delaware 19947

***Via U.S. Mail***
David R. Willey
28388 Evans Lane
Unit 1106
Dagsboro, DE 19939

Re: *John C. Ponder v. David R. Willey*
C.A. No. 2019-0349 PWG

Dear Counsel and Mr. Willey:

The last stage of a partition proceeding involves the division of the proceeds

from the sale of the partitioned property. This dispute addresses whether the

proceeds should be divided equally between two brothers who purchased property

as tenants in common, or whether one of the brothers is entitled to contributions for

payments he made related to the Property, as well as offsets against the other brother's share of the proceeds. I recommend the Court deny the contribution and offset claims, except for the offset related to property taxes paid when the property was sold. This is my final report.

## I. Background

On November 29, 2016, Petitioner John C. Ponder ("John") and his brother, Respondent David R. Willey ("David"), purchased real property ("Property") located at 34534 Hitch Pond Road, Laurel, Delaware, as tenants in common, from their brother, Robert Willey ("Robert").[1] The Property consisted of a three-bedroom, two-bathroom double-wide trailer located on approximately 1.6 acres.[2] John wanted the Property as a home for their mother to live in.[3] The parties agreed that the arrangement was for David to also reside in the home.[4] Their mother relocated to the Property shortly after its purchase and remained in the home until she passed away on or about October 31, 2018.[5] In addition, their mother's sister moved into the home around the end of July of 2018 and stayed in

---

[1] Docket Item ("D.I.") 1, Ex. A. I use first names in pursuit of clarity and intend no familiarity or disrespect.

[2] Trial Tr. 28:22-24; Trial Tr. 23:3-4.

[3] D.I. 1, ¶ 7.

[4] Trial Tr. 80:19-21; Trial Tr. 90:22-24.

[5] Trial Tr. 36:16-37:5.

the home until she died at the end of January of 2019.[6] David resided at the Property from the time of purchase until after the partition sale.

On May 13, 2019, John filed a petition ("Petition") to partition the Property and for contributions and offsets affecting the division of the partition sale proceeds between him and David.[7] Following a hearing on the Petition, a partition sale by public auction was ordered on July 3, 2019, and the Property was sold on October 1, 2019 for $80,000.00.[8] With no objections having been filed, the Trustee's return of sale was confirmed by the Court on October 30, 2019.[9]

John filed his petition for decree and order of distribution on November 18, 2010, asking that his share be increased by his $40,000.00 purchase payment, $16,150.00 for one-half of the fair rental value of the Property from the time of its purchase, $1,566.55 for one-half of the unpaid real property taxes, $2,353.44 for improvements he made to the Property, $19,015.00 for one-half of the waste committed by David on the Property, and attorney's fees and costs.[10] A decree for distribution hearing was held, using Zoom, on October 7, 2020.[11]

---

[6] Trial Tr. 108:12-16.

[7] D.I. 1.

[8] D.I. 10; D.I. 11, ¶¶ 5, 6.

[9] D.I. 14.

[10] D.I. 15, ¶ 30.

[11] The hearing was originally scheduled for March 16, 2020, and was rescheduled, due to the pandemic.

## II.  Analysis

This is my decision regarding the distribution of the partition sale proceeds. $67,692.68 in sale proceeds remains to be distributed, after partition sale costs of $12,307.32 are deducted from the $80,000.00 sale price.[12]  John's claims for offsetting liabilities or contributions related to the Property are addressed in turn below.  The party claiming contribution for repairs, improvements, taxes or other costs has the burden of proof.[13]

### A. Reimbursement of John's purchase costs

John seeks to be reimbursed for his $40,000.00 payment to purchase the Property, alleging that David made no contribution to the purchase price.[14] However, pursuant to the deed dated November 29, 2016, John and David each own 50% of the property.[15]  The evidence shows that David did contribute financially towards the purchase of the Property through the payment arrangement he made with Robert.[16]  Further, the agreement between John and David regarding

---

[12] D.I. 12, Ex. E.

[13] *Cf. Estate of Weber v. Weber*, 2014 WL 589714, at *6 (Del. Ch. Feb. 17, 2014).

[14] D.I. 15, ¶¶ 9, 10.

[15] D.I. 1, Ex. A.

[16] Robert testified that he believed, based upon statements from a realtor, the Property was worth $80,000.00 at the time he sold it to John and David. Trial Tr. 87:19-20.  And that the parties' agreement regarding the purchase of the Property was that John and David would be co-owners, with John paying $40,000.00 to Robert, and David paying another $40,000.00 to Robert in installments, since he had recently lost his job.  Trial Tr. 89:10-15.  John paid $40,000.00 up front.  D.I. 1, Ex. B.  Robert testified that there was

the Property's purchase included other contributions from David, such as performing maintenance of the Property.[17] David performed some aspects of the agreement, including cutting the grass, making repairs and living in the home with their mother until her death.[18] And, even assuming *arguendo* David breached the agreement, there is no evidence that the parties agreed John would be reimbursed for his $40,000.00 payment for a breach, or that reimbursing John for his payment is an appropriate remedy for a breach. To do so would value John's contribution to the exclusion of David's contributions under the agreement. Therefore, John is not entitled to be reimbursed for his $40,000.00 payment towards the purchase of the Property from the sale proceeds.[19]

### B. Claim for rental value benefit against David

---

no written agreement regarding the payment arrangement in order to save the cost of legal services to prepare the agreement. Trial Tr. 89:22-90:19. He further testified that David has paid him between $200.00 and $400.00 per month, and provides handyman services, to pay on the debt, and still owes him about $30,000.00. Trial Tr. 97:11-98:4. John confirmed that he believed Robert "had some sort of arrangement with David to do some labor, some work." Trial Tr. 32:3-5.

[17] Trial Tr. 52:17-19; Trial Tr. 96:21-23. John remembers that, in addition, the agreement was their mother would have the master bedroom, and David would not bring his dogs inside the home and would pay property taxes. Trial Tr. 79:4-18. David and Robert recall that David's main obligation under the agreement was to take care of their mother. Trial Tr. 94:7-9; Trial Tr. 114:7-8.

[18] Trial Tr. 79:11-13.

[19] Obligations under the agreement between David and Robert, with approximately $30,000.00 still due to Robert, are not addressed in this report or in this partition action.

John seeks $16,150.00 for one-half of the fair rental value of the Property from the time of its purchase, claiming that David ousted John by his "full and exclusive access" of the Property.[20] "A co-tenant living on property has no obligation to pay rent unless the co-tenants agreed that rent would be paid."[21] However, if a co-tenant has exclusive possession of the property and ousts other co-tenants, then the rental value (representing the benefit received by the co-tenant having exclusive possession) may be set off against their share of the sale proceeds.[22] In this case, there is not sufficient evidence that David had exclusive possession of the Property or that he ousted John. Although it is questionable whether John had a key to the Property, John stayed at the Property at various times while he and David co-owned the Property and accessed the Property when he visited their mother, typically once or twice a year.[23] There is no evidence John was excluded from accessing the Property by David. Accordingly, since no ouster

---

[20] D.I. 15, ¶¶ 12, 13, 30(b).

[21] *In re Real Estate of Hunsucker*, 2019 WL 1984242, at *3 (Del. Ch. May 3, 2019).

[22] *Id.*

[23] Trial Tr. 49:16-18. John testified that he did not have a key to the Property until April of 2018, when their sister got him a key. Trial Tr. 49:21-50:7. He further testified, however, that he didn't recall whether he had asked for a key prior to that time and stated "they didn't usually have the door locked." Trial Tr. 50:8-13. And that he stayed at the home on the Property for the majority of the time he came home for their mother's hospice care and that, after their mother passed, he was able to access the Property. Trial Tr. 77:12-20; Trial Tr. 50:21-51:11. David responded that, when he changed the locks, he had the locks keyed alike so there was no need to give John a new key. Trial Tr.113:23-114:2.

has been shown and there is no evidence David agreed to pay rent, David had no obligation to pay rent and no benefit from rental value is set off against him from the sale proceeds.[24]

## C. Contributions regarding property taxes

John claims $1,566.55 should be added to his share of the sale proceeds, representing one-half of the unpaid real property taxes. He asserts David agreed to pay all of the taxes as a part of the agreement regarding the purchase of the Property.[25] Generally, co-tenants share the cost of taxes on the property equally, because those costs benefit all of the co-tenants.[26] However, an agreement between the co-tenants distributing the payment of property obligations between co-tenants can affect that conclusion. Here, John testified that: he and David had an agreement that David would pay property taxes on the Property; the property tax invoices were mailed to David; and, at one point, when John became aware that

---

[24] John also argues that their mother and aunt paid rent to David while they resided at the Property, which was not shared with John. Trial Tr. 38:6-20. David responds that neither paid rent to him but acknowledges they serially paid him $200.00 per month towards utilities (their mother paying until her death and their aunt paying after that until her death). Trial Tr. 107:22-108:6. David did not share those payments with John, since they were for utilities, which he was responsible for. Trial Tr. 109:3-6. I find David's testimony credible, especially since John testified he knew their mother "wanted to contribute . . . towards some of the utilities." Trial Tr. 36:4-6.

[25] D.I. 15, ¶ 14.

[26] *Estate of Weber*, 2014 WL 589714, at *5 ("Delaware law requires cotenants to share equally the taxes imposed on jointly-owned property . . .") (citations omitted); *see also In re Real Estate of Turulski*, 1993 WL 18767, at *5 (Del. Ch. Jan. 21, 1993) (co-tenant is reimbursed for payments on taxes because they benefitted all of the co-tenants).

taxes on the Property were delinquent, he flew back from California to take David to set up payment arrangements on the overdue taxes.[27] John further testified David told him that he would make payments on the taxes – and "did pay a little bit on a couple different occasions," but "the amount of taxes that were past due were sizeable, thousands of dollars."[28] David responds that there is no evidence of any agreement regarding the taxes, although he testified that he made "three or four payments" on the taxes.[29] I find the credible evidence shows that David agreed to pay property taxes while he resided at the Property, as a part of the purchase agreement with John. In making this finding, I rely on David's admission that he repeatedly paid property taxes in the past (while John only made a small initial payment related to the payment arrangement for delinquent taxes established by David), and the tax invoice was sent to the Property (where David resided).[30] Such an obligation appears consistent with David's other obligations under the agreement, which allowed him to live at the Property rent-free.[31] Accordingly,

---

[27] Trial Tr. 61:11-62:7; Trial Tr. 64:3-5.

[28] Trial Tr. 61:12-13, 21; Trial Tr. 62:13-23.

[29] Trial Tr. 130:9-10; Trial Tr. 109:7-10.

[30] *See* Trial Tr. 64:3-5; Trial Tr. 61:19-20; Trial Tr. 63:1-5; Trial Tr. 109:7-10.

[31] John stated that it was David's failure to pay the taxes that led him to seek the partition of the Property. Trial Tr. 61:6-10. He testified it was his expectation that, if David complied with the agreement, David "was going to live [at the Property] for the rest of his life," even after their mother's death. Trial Tr. 79:24-80:2. For a long-term arrangement (extending after David's obligation to care for their mother ended), it is reasonable that David would be obligated to pay all of the property taxes.

8

John's share of the property taxes paid by the Trustee as partition sale costs will be paid by David, which means that David's one-half share of the sale proceeds will be reduced by $1,326.41 (one-half of the total – $2,652.82 – assessed in property taxes at the time of sale).[32]

### D. Improvements to the Property

John seeks $2,353.44 in contributions for improvements he made to the Property.[33] John testified the $2,353.44 represents expenditures he made on materials for improvements, including widening doors and replacing carpet with new flooring in several rooms in the home, which were made on or around May through July of 2018.[34] John testified that he purchased the materials and he and David, along with a couple of other helpers for specific jobs, completed the work

---

[32] John testified that the tax bill submitted showed $3,140.98 was due on property taxes as of the date of the partition sale. Trial Tr. 63:12-23; Pet'r's Trial Ex. 8. However, there is no evidence that amount was actually paid in taxes. The Trustee's return of sale shows the Sussex County property taxes paid as costs of the partition sale totaled $2,652.82, including $2,400.80 in delinquent taxes and $252.02 in taxes accrued between 7/1/19 and 10/31/19. D.I. 12, Ex. E. The parties have the burden of providing sufficient proof that their claimed contributions are not speculative. *See generally H & H Brand Farms, Inc. v. Simpler*, 1994 WL 374308, at *5 (Del. Ch. June 10, 1994). Without other evidence, I rely on the Trustee's return of sale as an accurate reflection of the amount of taxes paid at the partition sale and one-half of that amount is set off against David's share of the sale proceeds.

[33] D.I. 15, ¶ 18. John increased the request for expenditures on improvements at trial to $2,728.37, based upon the credit card statements entered into evidence at trial. Trial Tr. 48:6-17; Pet'r's Trial Ex. 4.

[34] Trial Tr. 45:12-46:20; John's credit card statements were highlighted to indicate materials related to improvements, but those statements show only that the expenditures

9

during that time.[35] Robert testified that, generally, when repairs were needed on the home, John would pay for the materials and David, with Robert's assistance at times, would make the improvements.[36] Both John and David testified that they each completed work on the home.[37]

In dividing partition sale proceeds between co-tenants, a court "may, as a matter of equity, take into consideration improvements by one cotenant and, 'to the extent those improvements have enhanced the value of the property, the improving cotenant will be compensated proportionally out of the proceeds of the sale.'"[38] Here, there is no evidence that the repairs or improvements performed by either co-tenant increased the market value of the Property. And, I cannot conclude that John's expenditures, if determined to be for improvements, exceed the value of the

---

were made at Walmart, Lowes, or Family Dollar stores in Delaware or Maryland, and not what items were purchased. Pet'r's Trial Ex. 4.

[35] Trial Tr. 46:19-47:6.

[36] Trial Tr. 95:9-13; Trial Tr. 102:24-103:10.

[37] John repaired holes in the wall shortly after its purchase. Trial Tr. 116:16-20. David and Robert testified that David completely redid one of the bathrooms, replacing the floor, toilet and sink. Trial Tr. 107:15-17; Trial Tr. 103:10-20. John recalled that David replaced the bathroom floor, saying the work was "shoddy," and indicated David "might have" done additional work. Trial Tr. 117:3-7; Trial Tr. 118:5-6; Trial Tr. 121:15-18; Trial Tr. 121:23-122:3.

[38] *Estate of Weber v. Weber*, 2014 WL 589714, at *5 (Del. Ch. Feb. 17, 2014) (citing *Burkett v. Ward*, 2012 WL 6764072, at *1 (Del. Ch. Dec. 19, 2012)); *Wilson v. Lank*, 107 A. 772, 773 (Del. Ch. 1919) ("where one tenant in common improves the premises the cost of the improvements is not necessarily the measure of his rights to compensation or allowance, but it is the enhancement in value of the premises by reason thereof which is taken into consideration on equitable principle").

labor performed by David on improvements, such that it would be equitable to increase John's share of sale proceeds. Therefore, I deny John's contribution claim for his expenditures on improvements.

### E. Waste on the Property

John argues that David should be assessed damages because he committed waste, decreasing the value of the Property.[39] John asserts David let his dogs damage the home and failed to adequately maintain the Property – leaving debris (disabled cars, trash, junk and an old piano) strewn throughout the yard, and the grass uncut, at the time of the partition sale.[40] David also refused access to the Property prior to, or at, the partition sale, which John argues had "a chilling effect on bidding" at the sale.[41]

The auctioneer at the partition sale testified that the weather was good the day of the auction, with 24 people attending the partition sale, 12 people registered to bid, and a final bid of $80,000.00.[42] He noted they had no access to the interior of the home or permission to be on-site.[43] When asked if the inability to access the interior of the home negatively affected the bidding process, the auctioneer

---

[39] D.I. 15, ¶ 22.

[40] *Id.*, ¶¶ 20, 21.

[41] *Id.*, ¶ 26.

[42] Trial Tr. 11:6-18.

[43] Trial Tr. 11:1-4.

11

responded that he did not know since it was the first time it had happened to him but it "probably did not assist in the sale of the property."[44] He commented on the unusual "debris" left outdoors on the Property, including cars, chairs, a boat, lawnmowers, a piano, and dog feces, testifying that the "condition of the property was not helpful."[45] He testified that the grass had not been cut in a month or more.[46] Although acknowledging that he is not a licensed real estate appraiser, the auctioneer testified that his gut feeling was that the Property would sell "within about 10 percent of a hundred thousand," and that the $80,000.00 sale price "didn't quite make it."[47] He also commented that "[i]t's hard to say what people would pay at auction."[48] There was only one bidder (besides John's attorney).[49] David responded that the condition of the yard would have "little impact at the auction."[50]

---

[44] Trial Tr.12:5-12.

[45] Trial Tr.12:19-13:14; Trial Tr. 13:18-23; Trial Tr. 14:11-13.

[46] Trial Tr.14:23-24.

[47] Trial Tr. 15:6-12; Trial Tr. 21:11-14.

[48] Trial Tr. 21:14-15. He testified that houses sell for less, and for more, than he thought they would. Trial Tr. 22:5-7.

[49] Trial Tr. 15:12-13.

[50] Trial Tr. 112:10-12.

Waste is "'a spoil or destruction in lands, houses, trees, or other corporeal hereditaments committed or permitted'."[51] A tenant in common can commit waste if they commit an act that causes substantial injury to the property.[52]

Here, the question is whether David's actions constituted waste – or whether he substantially injured, or substantially diminished the value of, the Property. Robert testified that, when John and David purchased the Property, there were significant problems with the home, including leaking water pipes underneath the home, and that the home was an approximately 30-year old mobile home that had not been updated since it was built.[53] Robert testified that there had been dogs in the home prior to David's moving into the home, David's dogs were in the home as soon as David moved in, and that he did not see damage caused by David's dogs after the improvements were made.[54]

It is undisputed that David left debris in the yard and the grass uncut at the time of the partition sale. Although it is possible those actions may have caused

---

[51] *Pilots' Ass'n for Bay & River Delaware v. Lynch*, 1992 WL 390697, at *3 (Del. Super. Nov. 19, 1992) (citation omitted).

[52] *Whitehead v. Whitehead*, 181 A. 684, 686 (Del. Ch. 1935); *see also Voss v. Green*, 389 A.2d 273, 274 (Del. Super. 1978) ("[a] singular act of waste, [when the land was thereafter] put to productive agricultural use, [does not constitute a] showing that such use as such was a spoilage or was destructive of the land").

[53] Trial Tr. 93:17-22; Trial Tr. 92:21-24.

[54] Trial Tr. 95:14-96:5. John may have desired that David not allow his dogs into the home but, if that was a condition of their agreement, there is no evidence that John

13

some reduction in the sale price, actual diminishment in value because of the debris or the uncut grass has not been shown – or quantified. The auctioneer's testimony that it was his "gut feeling" the Property would sell for more than the $80,000.00 it sold for (within 10% of $100,000.00) must be contrasted with his statement that it is "hard to say" what a property will sell for during an auction. And, I cannot conclude that the "comparable" properties John presented to show that the Property should have sold for a higher price, are actually comparable to the Property.[55] Therefore, I find there is not sufficient evidence to show David's actions substantially diminished the value of the Property, or he committed waste.

## F. Attorneys' fees and costs

John seeks to offset $5,572.18 in his attorneys' fees and costs against David's share of the sale proceeds.[56] "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs,"

---

notified David of his breach and took steps to prevent him from continuing to keep the dogs in the house.

[55] The auctioneer reviewed sale prices of other properties close to the Property, including one that settled at $118,000.00 on July 30, 2019 (from the foreclosure) and then sold on June 30, 2020 for $139,000.00, which he said was similar in size although "a little newer." Trial Tr. 16:9-17:6. Unlike the Property, that property appears to be a single-family home (not an older mobile home), with three bedrooms and five bathrooms, in good condition. *See* Pet'r's Trial Ex. 9. He also commented on another property that settled for $230,000.00, noting that it was a six-acre tract – significantly larger than the Property. Trial Tr. 17:23-18:1.

[56] D.I. 15, ¶ 29.

including attorneys' fees.[57] Equitable exceptions to the American Rule include the bad faith exception,[58] as well as the "common fund doctrine" and the related "common benefit doctrine," which are based "on the equitable principle that those who have profited from a litigation should share its costs."[59] Here, I find no basis to shift John's attorneys' fees and costs onto David. There is no evidence of bad faith conduct by David during the litigation, or that John's efforts, in seeking to partition the Property, produced a benefit that would not otherwise have existed.[60] Therefore, John's claim for attorneys' fees and costs is denied and he must bear his own attorneys' fees and costs.

---

[57] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Korn v. New Castle Cty.*, 2007 WL 2981939, at *2 (Del. Ch. Oct. 3, 2007).

[58] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (citation omitted); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted). "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process." *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citation omitted).

[59] *Korn*, 2007 WL 2981939, at *2 (citation omitted).

[60] The common benefit doctrine "is designed to equitably spread the costs of producing a benefit realized by a group, which benefit, absent the [Petitioner's] efforts, *would not exist.*" *Moore v. Davis*, 2011 WL 3890534, at *2 (Del. Ch. Aug. 29, 2011). Through the partition sale, the co-owners "exchang[ed] an asset of equal value, i.e., the co-tenants exchange[d] an undivided fractional ownership in the property for a corresponding fractional interest in the net value of the property upon sale," so the exchange was "a wash." *Estate of Proffitt v. Miles*, 2012 WL 3542202, at *2 (Del. Ch. Aug. 4, 2012); *Moore*, 2011 WL 3890534, at *2.

15

## III.    Conclusion

For the reasons set forth above, I recommend the Court find that John is entitled to receive $35,172.75, and David is entitled to receive $32,519.93 of the $67,692.68 remaining in the sale proceeds, after costs of the partition sale were paid.[61]    This is a final report and exceptions may be filed pursuant to Court of Chancery Rule 144.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

---

[61] If the remaining sale proceeds were split equally, David and John would each receive $33,846.34.  David's share is reduced by one-half of the property taxes paid as a part of the partition sale, or $1,326.41, and John's share of the sale proceeds is increased by the same amount.

16